J-S04018-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.A.T., A MINOR | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.D.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2816 EDA 2019 |

Appeal from the Order Entered September 13, 2019
In the Court of Common Pleas of Montgomery County
Orphans' Court at No: No. 2019-A0040

BEFORE: BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 7, 2020**

D.D.H. ("Father") appeals from the order entered September 13, 2019, which terminated involuntarily his parental rights to his son, J.A.T., born in April 2017 ("Child").[1]  We affirm.

The Montgomery County Office of Children and Youth ("OCY") became involved with the family on February 1, 2018, when Mother brought Child to the Pottstown Office of OCY and stated that she was homeless and looking for resources.  N.T., 8/6/19, at 6-7.  Due to a previous history with OCY, Mother was urine screened, and tested positive for methamphetamine, amphetamine, and tetrahydrocannabinol ("THC").  *Id.* at 7.  The identity and whereabouts of Child's father were unknown.  N.T., 9/12/19, at 15-16.  Due to Mother's

---

[1] That same day, the court terminated involuntarily the parental rights of L.S.D.T. ("Mother").  Mother has not appealed the order and has not filed a brief in the instant appeal.

homelessness, substance abuse, and lack of appropriate caretakers, OCY obtained an order for emergency protective custody of Child. N.T., 8/6/19, at 7. Following a shelter care hearing on February 2, 2018, Mother did not maintain contact with OCY and her whereabouts were unknown. *Id.* at 9-10, 24-25. In July 2018, Father was identified as a putative father of Child, ordered to undergo paternity testing, and later confirmed to be Child's biological father. N.T., 9/12/19, at 16-17.

Family service plans were created for the family on February 12, 2018; August 12, 2018; and February 8, 2019. N.T., 8/6/19, at 21-22. At a permanency review hearing on August 16, 2018, the court found that Father was making no compliance with the permanency plan, denied paternity of Child, and did not present as a resource for Child. Order, 8/20/18, at 1. At a permanency review hearing on November 8, 2018, the court found that Father was making minimal compliance with the permanency plan and had begun visiting with Child. Order, 11/9/18, at 1. Following that hearing, specific family service plan goals were identified for Father, and included maintaining a relationship with Child; keeping in contact with OCY; updating OCY regarding housing; providing pay stubs; and avoiding positive drug screens. N.T., 9/12/19, at 23. At a permanency review hearing on February 14, 2019, the court found that Father was in minimal compliance with the permanency plan and, although Father had continued visitation, he indicated that he was not able to be a resource for Child. Order, 2/15/19, at 1.

On March 22, 2019, OCY filed a petition to terminate involuntarily Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).

The court held hearings on the petition on August 6, 2019, and September 12, 2019. OCY presented the testimony of Clare Henderson, formerly an OCY supervisor at the Pottstown intake unit; Brenda Michael, program manager at Friendship House; Krystal Dukes, OCY casework supervisor for the Pottstown office; D.L., legal father of Child;[2] Lori Ann Heath, formerly the ongoing OCY caseworker for Child; and Susan Rhoads, the adoption caseworker assigned to Child. Father, represented by counsel, testified on his own behalf via telephone. Child was represented during the duration of the case by Robert Angst, Esquire, as legal counsel; at the final hearing, Child was represented by Eileen Schaefer, Esquire, as legal counsel.

Lori Heath testified that she was the ongoing caseworker for Child. N.T., 9/12/19, at 15-16. During the first few months of the case, OCY was not aware of the identity of Child's father. *Id.* at 16. Family members of Child's mother suggested that Father might be the biological father of Child, and, after an Accurint search, Father was found. Father participated in a paternity

---

[2] D.L. was identified as the legal father of Child on the birth certificate, but was later excluded as the biological father of Child by paternity testing. N.T, 9/12/19, at 3-12. D.L. prepared a petition to voluntarily relinquish his parental rights to Child, which was accepted at the September 12, 2019 hearing. *Id.*

test, which confirmed his paternity. *Id.* Father lived in Wisconsin, although OCY did not have an exact address for him at that time. *Id.* at 17.

Ms. Heath testified that paternity was established in July 2018 and Father began visiting in October 2018. *Id.* Ms. Heath stated that Father indicated to her that he had not been involved with Child because Mother's family had called Father and said Mother had miscarried. *Id.* at 26. Thus, Father claimed he had not known about Child until OCY made contact. *Id.* at 26. However, Ms. Heath acknowledged that there were conflicting stories within Mother's family, as her sister stated that was not true. *Id.* at 26. Regardless, Mother and Father did not have a long-term relationship. *Id.*

Initially, Father requested visits every other week since he was travelling from Wisconsin. *Id.* at 17. Father visited on October 15, 2018; October 30, 2018; and November 9, 2018, for an unconfirmed visit. *Id.* at 17-18. At the October 15, 2018 visit, Father discovered that Mother's sister was visiting with her child at the same time, and had to be repeatedly pulled out of that visit room. *Id.* at 28. Ms. Heath took a urine screen from Father at the November 8, 2018 permanency review hearing, and it was positive for THC. *Id.* at 20-21. Father acknowledged that he had smoked marijuana. *Id.* at 21. At each of the visits, Father indicated a different living situation from the original address that had been considered for the interstate compact. *Id.* at 22-23. After the third visit, family service plan goals were provided for Father, namely, to maintain a relationship with Child, keep in contact with OCY, and to update OCY regarding Father's housing. *Id.* at 23. Father was

also to provide Ms. Heath with pay stubs to prove employment, and to avoid positive drug screens. *Id.* at 23.

Father was supposed to attend a visit on November 27, 2018, but emailed Ms. Heath the day before to cancel. *Id.* at 18. Ms. Heath testified that, after Father's cancellation, she texted back and forth with him over the next few days, but he did not confirm a visit. *Id.* at 19. Ms. Heath sent Father a letter on December 5, 2018, asking him to schedule a visit; Father did not reply until December 14, 2018, asking about visits. *Id.* Ms. Heath testified that, based on the wording of the email, she did not believe the email was written by Father. *Id.* Ms. Heath asked to speak to Father on the phone, but did not receive a reply. *Id.* Ms. Heath believed the email was written by Father's significant other, and they were stating that they had split up, and Father would still like to have visits. *Id.* Ms. Heath did not hear from Father again until January 9, 2019; Father gave her a home address but did not schedule a visit. *Id.* Ms. Heath re-sent the December 5, 2018 letter to the new address, but did not receive a response. *Id.* at 20. On January 11, 2019, Ms. Heath received a text from Father stating that he would not be able to care for Child. *Id.* at 20. Father indicated he was between homes and had lost his job, and did not feel he would be able to care for Child. *Id.* After that text, Ms. Heath did not receive any further contact from Father. *Id.*

Ms. Heath testified that, throughout the history of the case, Father made no progress on his goals. *Id.* at 23-24. Specifically, once Father was given goals, there was no further contact from him. *Id.* at 24. Ms. Heath did not

believe that Child had a bond with Father; Child did not seem to recognize Father at the third visit.  *Id.* at 24.  Ms. Heath believed it was in Child's best interest to be adopted.  *Id.*  Child has taken to the family very well, is bonded with both parents, and has become part of the family.  *Id.*

Brenda Michael testified that she is the program manager of Friendship House, through which Child was placed into foster care in May 2019.  N.T., 8/6/19, at 14-15.  Child is in a pre-adoptive placement with a same-sex married couple in Collegeville, and is adjusting well to their home.  *Id.* at 15. Prior to Child's pre-adoptive placement, he was placed with a previous foster family, with whom he is still in contact.  *Id.* at 18.  Child has transitioned well from foster home to foster home.  *Id.*  Child is loving and affectionate with both of his foster mothers, who are engaging and nurturing to him.  *Id.* at 16. Child, who was two years old at the time of the hearing, was well ahead of the development curve and showing some athletic ability.  *Id.* at 19.

No visitation has occurred with Child's birth family members since Ms. Michael became involved with the case, nor has any contact or outreach occurred from either birth parent.  *Id.* at 16-17.  Ms. Michael testified that it was her belief that it was in the best interest of Child to be adopted; Father made a few visits at the end of last year, but indicated that he could not be a resource for Child.  *Id.* at 17.  Child needs permanency and is with a family willing to provide that for him.  *Id.*

Father testified that once he discovered he had a son, he attempted to arrange visits with Child.  N.T., 9/12/19, at 41.  Father requested that the

court not terminate his parental rights because he is a hardworking father, he is trying, and had recently broken up with the woman he was seeing. *Id.* Father testified that he is trying to "get everything under control." *Id.* at 41-42. Father testified that he loved Child from the moment he found out about him and has been trying to be in contact or "at least" visit. *Id.* at 42. Father stated he recently acquired his own housing, is working, and has family support from his mother and aunt. *Id.* Father claimed that he could take Child in about a week as he has clothes, a place for Child to sleep and "all [he] really need[s] is baby food." *Id.* at 43.

Father admitted that he had not had any contact with Child since November 2018, either in person, by phone, or on FaceTime, although Father stated he had spoken with an adoption worker named Sue.[3] *Id.* Father admitted that he had not sent Child any gifts or cards for his birthday or the holidays, had not paid child support, and was not sending food or clothing to care for Child. *Id.* at 44. Father stated that his girlfriend answered his phone. *Id.* at 44-45. Father stated that sometime in August 2019 he had emailed Ms. Rhoads his new address and phone number along with his mother's phone number. *Id.* at 45.

Susan Rhoads testified that she is Child's adoption caseworker. N.T., 9/12/19, at 50-51. She established email contact with Father in March 2019, when she was writing a child profile for Child and needed family background

_____

[3] "Sue" was Susan Rhoads, Child's adoption caseworker.

information. *Id.* at 51. In June 2019, Ms. Rhoads let Father know of the impending hearing and to get an idea of what Father's position was; she did not get much of a response and long periods of time would go by between responses. *Id.* Ms. Rhoads emailed Father following the August 6, 2019 hearing to inform him that the hearing had been continued, and sent him a copy of the notice that had been mailed to the address provided. *Id.* Father replied that he had received the notice. *Id.* At that same time, Ms. Rhoads asked Father if he would like counsel for the proceedings, and Father did not respond. *Id.* at 52. At one point, Father asked what he could do to get Child back, but he did not request more visits. *Id.* Ms. Rhoads reached out to counsel for OCY to have an attorney appointed just in case. *Id.* at 52-53.

At the conclusion of the hearing, the court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b), and changed Child's permanent placement goal to adoption, 42 Pa.C.S.A. § 6351. Father timely filed a notice of appeal from the termination of his parental rights and a statement of errors complained of on appeal pursuant to 1925(a)(2)(i) and (b).

On appeal, Father raises the following issue for our review:

> 1. The [t]rial [c]ourt erred in finding clear and convincing evidence existed to terminate [Father's] parental rights under 23 Pa.C.S.[A.] Section 2511(a).

Father's Brief at 4.

We review cases involving the termination of parental rights according to the following standards.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We thus turn to the trial court's order terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b). The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section

2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa.

Super. 2004) (*en banc)*. We focus our analysis on 23 Pa.C.S.A. § 2511(a)(1)

and (b).

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \*\*\*
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

With regard to Section 2511(a)(1), this Court has observed that

> To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). The

court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b).  **Id**. (quoting **In re Adoption of Charles E.D.M.**, 550 Pa. 595, 708 A.2d 88, 92 (1998)).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child."  **In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (2005) (quoting **In re C.M.S.**, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 580 Pa. 687, 859 A.2d 767 (2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances."  **Id**. (citation omitted).

**In re J.T.M.**, 193 A.3d 403, 409 (Pa. Super. 2018).

With regard to Section 2511(b), "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship."  **Z.P.**, 994 A.2d at 1121.  The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well.  **Id.**  Ultimately, the concern is the needs and welfare of a child.  **Id.**

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension.  Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful.  The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to

consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

**Z.P.**, 994 A.2d at 1121 (quoting **In re C.S.**, 761 A.2d 1197, 1202 (Pa. Super. 2000)).  The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  **See In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011); **see also In re K.Z.S.**, 946 A.2d 753, 763 (Pa. Super. 2008) (court may emphasize the safety needs of child).  Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.  **Id.**  "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment."  **In re B.,N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

In this case, we do not review the order pursuant to Section 2511(b) because Father did not preserve the issue in his concise statement of errors complained of on appeal, nor in his statement of questions involved in his brief on appeal.  **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal); **see also In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating failure to include argument/discussion in brief as to issue results in waiver of that claim) and **In re M.Z.T.M.W.**, 163 A.3d 462, 465-66 (Pa. Super. 2017) (same).

With regard to Section 2511(a)(1), Father argues that he was not aware of Child's existence until July 2018 and immediately began making arrangements to travel from Wisconsin to Pennsylvania to establish a relationship with Child. Father's Brief at 6-7. Father notes that he visited Child three times over the next two months, and also attended a court hearing. *Id.* Father contends that he contacted OCY several times to set up visits in November 2018, and asked about visits in December 2018 and January 2019. *Id.* Father argues that he was not able to perform his parental duties because he was unaware of Child, and was not prepared to perform his parental duties, but should not be denied the opportunity now. *Id.*

The record is clear that, for six months prior to the filing of the termination petition, Father failed to perform parental duties. The relevant time period begins September 22, 2018. It is possible that Father was unaware of Child's existence until July 2018. It is true that Father visited with Child three times in October 2018 and November 2018. However, as the trial court observed,

> [Child] has never been in the custody of [Father]. When [Child] was 15 months old, [Father] was identified as [Child's] birth father after taking a paternity test. Another man was listed as the father on the birth certificate of [Child].
>
> [Father] was a resident of Wisconsin when he learned in July 2018 that he was the birth father of [Child]. With the goal of obtaining custody of [Child] through an interstate compact, [Father] agreed to comply with the terms of [an FSP].
>
> [Father] was unable to work on the interstate compact because he did not have a definite address. He made no progress on his

> FSP goals involving maintaining a relationship with [Child], providing OCY with his pay stubs, clean urine screens, and consistent contact with OCY regarding his housing updates.
>
> Initially, [Father] requested biweekly visits due to the travel distance from his Wisconsin residence. He visited [Child] on October 15, 2018, and again on October 30, 2018. In connection with [Father]'s attendance at a Permanency Review Hearing, [Father] last visited with [Child] on November 8, 2018. During that visit, [Father] provided a urine screen that was positive for THC. [Father] cancelled his scheduled November 27, 2018 visit by notice of an email on November 26, 2018.
>
> Subsequent contacts with OCY by [Father] were sporadic, most often in the form of emails that were never followed-up with phone calls, as requested. In his January 11, 2019 text to OCY, [Father] admitted that he was unable to care for [Child] because he was in-between homes and in-between jobs.
>
> Since learning that he was the birth father of [Child], [Father] provided no child support, clothing or food for [Child]. [Father] has not given [Child] gifts, or even cards, for his birthday or holidays. [Father] has had no contact with [Child] since his November 8, 2018 visit, despite the available use of phone calls or face time.

Trial Court Opinion, 10/15/19, at 3-4 (internal citations to the record omitted).

These observations are supported by the record. Despite three visits, Father made no other efforts to perform parental duties or even to contact Child during the relevant time period. *See*, *e.g.*, *J.T.M.*, 193 A.3d at 409.

Accordingly, we examine Father's explanation for his failure. Here, the trial court noted that Father did not provide credible testimony regarding his lack of support and contact with Child during the six-month period prior to the filing of the petition but, instead, focused on his efforts to prepare for future custody of Child. Trial Court Opinion, 10/15/19, at 4. The record supports this conclusion. Father implied that his life had gotten out of control and that

he had recently lost a job and housing, but never gave further explanation as to why he failed to comply with his FSP goals or even to attempt to contact Child. As this Court has observed, parental duty requires that the parent "act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." **B.,N.M.**, 856 A.2d at 855. Here, despite Father's argument that he should be allowed to perform parental duties now, there is no evidence that he attempted to perform parental duties in any significant manner prior to the filing of the petition. Additionally, the record established that outside of the three visits discussed earlier, there was no post abandonment contact whatsoever with Child, only vague attempts to schedule visits with caseworkers that never finalized.

Finally, the court appropriately concluded that, based upon the testimony provided, there was no bond between Child and Father. Trial Court Opinion, 10/15/19, at 5. Child did not even recognize Father by the third visit, and there was credible testimony provided that Child was bonded with his foster mothers, is an integral part of their family, and is thriving in his placement. Caseworkers testified that it was in Child's best interest to be adopted.

Consistent with the foregoing, we conclude that the evidence supports the termination of Father's parental rights pursuant to Section 2511(a)(1). Father failed to perform parental duties for six months prior to the filing of the petition, did not provide an adequate explanation for his conduct, had minimal

- 15 -

post-abandonment contact with Child. Accordingly, the court did not err in terminating Father's parental rights involuntarily pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/7/2020